Kevin F. Ruf (SBN 136901)
*kruf@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Keith Conners*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH CONNERS, derivatively on behalf of GROCERY OUTLET HOLDING CORP.,<br><br>Plaintiff,<br>v.<br><br>ROBERT JOSEPH SHEEDY, CHARLES C. BRACHER, ERIC J. LINDBERG, JR., ERIK D. RAGATZ, KENNETH W. ALTERMAN, JOHN E. BACHMAN, MARY KAY HABEN, THOMAS F. HERMAN, CAREY F. JAROS, GAIL MOODY-BYRD, and JEFFREY R. YORK,<br><br>Defendants,<br><br>and<br><br>GROCERY OUTLET HOLDING CORP.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Keith Conners ("Plaintiff"), derivatively on behalf of Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"), brings the following Shareholder Derivative Complaint pursuant to California law against the Company's board of directors (the "Board") and executive officers (together, "Director and Officer Defendants" or "Individual Defendants") for breaches of fiduciary duties. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) media reports; and (iii) pleadings filed in the federal securities class action *Liberato v. Grocery Outlet Holding Corp. et al*, Case No. 4:25-cv-00957-JST (N.D. Cal.).

**NATURE OF THE ACTION AND OVERVIEW**

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Grocery Outlet, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least November 7, 2023 through May 7, 2024 (the "Relevant Period"). During that time, the Defendants (as defined herein) caused or allowed Grocery Outlet to issue or make materially false and misleading statements concerning the Company's financial condition and business operations. Additionally, the Defendants caused or allowed Grocery Outlet to file false and misleading statements with the SEC.

2. Grocery Outlet describes itself as "a high-growth, extreme value retailer of quality, name-brand consumables and fresh products sold through a network of independently owned and operated stores." There are over 400 Grocery Outlet stores throughout the U.S.

3. The Director and Officer Defendants disclosed to investors material information regarding Grocery Outlet's expected profit for fiscal year 2024, which ended on December 28, 2024. The Director and Officer Defendants' statements included, *inter alia*, belief in the Grocery Outlet's capability to successfully upgrade and transition the Company's internal systems in an appropriate

and efficient manner, while mitigating the risks associated with the ongoing obstacles the Company was facing regarding the transition.

4. The Director and Officer Defendants provided these strongly positive statements to the public while simultaneously publishing materially false and misleading statements and/or concealing material adverse facts regarding the actual status of Grocery Outlet's transition to new and upgraded systems; notably, that the Company was either not truly ready to timely and effectively carry out the transition or otherwise failed to disclose the potential for significant obstacles to Grocery Outlet's profitability as a result of delays and implementation issues which affected the Company's performance. Such statements absent these material facts caused Plaintiff and other shareholders to buy Grocery Outlet's securities at artificially inflated prices.

5. After the market closed on May 7, 2024, Grocery Outlet announced its financial results for the first quarter of its fiscal year 2024, disclosed markedly below-expectation guidance for the second quarter, and further reduced its guidance for the full fiscal year 2024. The Company blamed its results and lowered guidance on "unforeseen systems transition costs that surfaced at the end of the quarter" and the resulting "residual expense from our commission support program as we finish store physical inventory counts in the second quarter."

6. Investors and analysts reacted at once to Grocery Outlet's revelation. The price of Grocery Outlet's common stock declined precipitously. From a closing market price of $25.90 per share on May 7, 2024, Grocery Outlet's stock price fell to $20.88 per share on May 8, 2024, a decline of around 19.38% in one day.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

8. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this court under 28 U.S.C. § 1391 because Grocery Outlet is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## PARTIES

### A. Plaintiff

11. Plaintiff Keith Conners is a current shareholder of Grocery Outlet and has continuously held Grocery Outlet stock during all times relevant hereto and is committed to retaining Grocery Outlet shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Grocery Outlet and its shareholders in enforcing its rights.

### B. Nominal Defendant

12. Nominal Defendant Grocery Outlet is a corporation organized under the laws of the State of Delaware. The Company's principal executive offices are located at 5650 Hollis Street, Emeryville, California 94608. Grocery Outlet's common stock trades on the Nasdaq exchange ("Nasdaq") under the ticker symbol "GO".

### C. Director and Officer Defendants

13. Defendant Robert Joseph Sheedy started with Grocery Outlet in 2012 as VP of Strategy. Sheedy served as Grocery Outlet's President from 2019 until his resignation on October 30, 2024. Sheedy was the Company's Chief Executive Officer ("CEO") from January 1, 2023 until

his October 30th resignation. Sheedy was also a Director of the Company from January 2023 until his October 30th resignation. According to the Schedule 14A the Company filed with the SEC on April 19, 2024 (the "2024 Proxy Statement"), as of April 9, 2024, Defendant Sheedy owned 198,687 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Sheedy owned roughly $5.42 million worth of Grocery Outlet's common stock at that time.

14. For the fiscal year ended December 30, 2023 ("2023 Fiscal Year"), Defendant Sheedy received $6,239,771 in total compensation from the Company, which was composed of $922,466 in salary, $3,996,047 in stock awards, $1,283,368 in non-equity incentive plan compensation, and $37,890 in all other compensation.

15. The 2024 Proxy Statement stated the following with respect to Defendant Sheedy:

> ***Career Highlights***
>
> Since April 2012, served various positions at **Grocery Outlet and its predecessor**, including as President and Chief Executive Officer (*since Jan.* 2023), President (*Jan. 2019 to Dec. 2022*), Chief Merchandise, Marketing & Strategy Officer (*Apr. 2017 to Dec. 2018*), Chief Merchandise & Strategy Officer (*Mar. 2014 to Apr. 2017*) and VP, Strategy (*Apr. 2012 to Feb. 2014*).
>
> 2005 to 2012, served various positions at **Staples Inc.**, an office supply company, most recently as its Vice President, Strategy.
>
> ***Public Company Boards***
>
> None
>
> ***Other Information***
>
> He received a Bachelor of Arts in Economics and Engineering from Dartmouth College, and a Master of Business Administration from Harvard Business School.
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> - Strong executive leadership experience at public companies in retail, with particular expertise in strategy, marketing and merchandising.
>
> - Recently selected to lead Grocery Outlet into the next chapter of growth due to his significant experience and expertise in the grocery

> and retail industries, his deep knowledge of our business through his varied leadership roles, and his long-term strategic approach. As our President and CEO, he is responsible for our strategic direction and operational leadership, and has extensive knowledge of the day-to-day operations of our business. His leadership style exemplifies our culture and values—he is passionate about the business, and his relentless pursuit of excellence resonates with and inspires our team and our Independent Operators.
>
> - Possesses significant marketing and brand management expertise from multi-year leadership of our centralized marketing efforts, including our recent focus on online and digital marketing, and supporting Independent Operator marketing efforts.
>
> - In his roles as President and strategy leader, he implemented our significant growth initiatives and investments that have laid a solid foundation for future expansion, including productivity improvements through both operational initiatives and digital transformation projects.
>
> - RJ was promoted four times prior to his recent appointment, and he can provide unique insights on our human capital management program. He values the importance of our employee development strategic initiative, including our culture of mentoring and coaching. Due to the uniqueness of our business model, we prioritize growing talent internally and investing resources to develop our employees' skill sets and career within our organization.

(Emphasis in original.)

16. Defendant Charles C. Bracher served as Executive Vice President and Chief Financial Officer ("CFO") of Grocery Outlet until his resignation on March 1, 2024. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Bracher owned 220,024 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Bracher owned roughly $6.01 million worth of Grocery Outlet's common stock at that time.

17. For the 2023 Fiscal Year, Defendant Bracher received $2,215,811 in total compensation from the Company, which was composed of $592,904 in salary, $1,189,080 in stock awards, $395,937 in non-equity incentive plan compensation, and $37,890 in all other compensation.

18. Defendant Eric J. Lindberg, Jr. ("Lindberg") has served as a Company director since 2006, and as Chairman of the Board since January 1, 2023. He has also served as Interim President and CEO since October 31, 2024. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Lindberg owned 3,292,394 total shares of Grocery Outlet common stock, which was 3.3% of the common stock at that time. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Lindberg owned roughly $89.9 million worth of Grocery Outlet's common stock at that time.

19. For the 2023 Fiscal Year, Defendant Lindberg received $388,027 in total compensation from the Company, which was composed of $225,000 in fees earned or paid in cash, and $163,027 in stock awards.

20. The 2024 Proxy Statement stated the following with respect to Defendant Lindberg:

> ***Career Highlights***
>
> 1996 to 2022, served various positions at **Grocery Outlet and its predecessor**, including as Chief Executive Officer (*Jan. 2019 to Dec. 2022*) and Co-Chief Executive Officer (*Jan. 2006 to Dec. 2018*).
>
> ***Public Company Boards***
>
> None
>
> ***Other Information***
>
> He received a Bachelor of Arts in Economics from Hampden-Sydney College.
>
> ***Skills and Qualifications Relevant to Service on our Board***
>
> • Possesses significant experience in the retail and consumer packed goods industries, garnered over his 26-year tenure with us, including 17 years as CEO or co-CEO. From 2000 to 2022, active member of the GMA/FMI (Grocery Manufacturers of America/Food Marketers Institute) and member of CGA board-(California Grocers Association 2014-2019).
>
> • Proven executive manager, including long service to Grocery Outlet as a private company and then as a public company following our IPO in June 2019. Eric's 17-year run as co-CEO and CEO was transformative for Grocery Outlet. Under his leadership, Grocery Outlet grew its store base from 123 to 441

> stores, or 259%, and revenues from $612.6 million to $3.58 billion, or 484%, and developed a bi-coastal store footprint. He led sharing our vision and strategy in the IPO and thereafter in developing key stockholder relationships.
>
> - Eric's deep knowledge of our operations, finances, strategies and industry facilitates a strategic vision to set the overall tone and direction of the Company as well as clear leadership through consistency. As our leading executive, he implemented fundamental strategic initiatives that enhanced our differentiated model for buying and selling, and strengthened our relationships with entrepreneurial Independent Operators that run our stores, combining to deliver a "WOW!" shopping experience. In his current oversight role, his unique insights on future strategy and initiatives will continue to be invaluable to our Board.
>
> - Exhibited strong growth focus across all macroeconomic cycles, as demonstrated by our pattern of positive comparable store sales growth and healthy gross margin rates. For example, our comparable store sales increased for 19 out of 20 years through fiscal 2022.
>
> - Long-standing role with our Board and management allows him to provide a unique perspective regarding oversight of enterprise risk management, including focusing on the most critical risks and evaluating risk mitigation activities.
>
> - Has alignment with our other stockholders due to his 3.3% ownership of the Company.

(Emphasis in original.)

21. Defendant Erik D. Ragatz has served as a Company director since 2014. He is the Lead Independent Director. Ragatz also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Ragatz owned 440,471 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Ragatz owned roughly $12.02 million worth of Grocery Outlet's common stock at that time.

22. For the 2023 Fiscal Year, Defendant Ragatz received $309,249 in total compensation from the Company, which was composed of $146,222 in fees earned or paid in cash, and $163,027 in stock awards.

23. The 2024 Proxy Statement stated the following with respect to Defendant Ragatz:

***Career Highlights***

Since Sept. 2001, served various positions at **Hellman & Friedman LLC**, a global private equity firm focused on investing in high-quality, growth-oriented business, including as Senior Advisor (since *Feb. 2023*), Partner (*Jan. 2008 to Feb. 2023*), and Director/Principal (*Sept. 2001 to Dec. 2007*).

Prior, served in various positions at **Bain Capital, LP**, a global private equity firm, and **Bain & Company**, a global management consultancy.

***Public Company Boards***

| Current | Prior |
|---|---|
| **Snap One Holdings Corp.** (*since Aug. 2017*), a leading omnichannel supplier of connected home products and solutions to home integrators. *Nasdaq: SNPO (since July 2021)*<br><br>• Chairman (*since Aug. 2017)*<br><br>• Nomination and Governance Committee Chairman (*since July 2021*)<br><br>• Compensation Committee Chairman (*Aug. 2017 – July 2021*), Member (since *July 2021*) | **LPL Financial Holdings, Inc.** (*2009 to 2012*), a leading provider of brokerage and investment advisory services. *Nasdaq: LPLA* |

***Other Information***

Mr. Ragatz also serves on several boards and board committees of other companies:

- Since July 2021, **At Home Group, Inc.**, a leading omnichannel home décor value retailer, including serving as Executive Chairman (*since Nov. 2023*) and a member of the Compensation Committee (*since July 2021*), and previously as Lead Independent Director (*July 2021 to Nov. 2023*).

- Since Oct. 2023, **The New Leaf Company BV (dba Superplum)**, an early-stage agri-tech business, including serving as Chairman.

- Since Feb. 2024, **And Go Concepts, LLC (dba Salad & GO)**, a disruptive quick service restaurant on a mission to make fresh, nutritious food convenient and affordable to all.

He previously served on additional private company boards of H&F, including board leadership roles, in the following industries: auto collision repair (*2014 to 2023*), building products manufacturing and distribution (*2010 to 2020*), HVAC manufacturing and distribution (*2008 to 2012*), healthcare services (*2007 to 2011*), and energy generation (*2004 to 2005*).

He received a Bachelor of Arts in Economics from Stanford University, and a Master of Business Administration from Stanford University Graduate School of Business.

***Skills and Qualifications Relevant to Service on our Board***

- Developed significant strategic and operations expertise for retail, supply chain and logistics matters through leading H&F's efforts to invest in high-growth global companies in the consumer, retail and industrial sectors, and taking leadership roles on the boards and board committees of the relevant portfolio companies for over 20 years.

- Strong other public company director experience through his board and board committee service at Snap One and LPL Financial, and together with his significant private company director experience, he has a unique expertise in corporate governance. His significant leadership roles on boards outside of our Board include serving as Chairman or Lead Independent Director of six companies (including one public company), Chair of the Compensation Committee of three companies, Chair of the Audit Committee of three companies (including one public company) and Chair of the Nominating and Corporate Governance Committee of one public company. This breadth of experience and expertise leading boards and board committees enables him to provide critical insights in overseeing and partnering with management of high-growth companies.

- Through serving as Chairman or a member of numerous Audit Committees of public and private companies, being a senior leader on H&F's investment team and leading H&F's macro-economic research and forecasting, he has significant finance, accounting and financial reporting expertise, including for retail and high-growth companies.

- His knowledge and expertise regarding enterprise risk oversight for high-growth companies was developed through his public and private company board roles, as well as having responsibility for the full lifecycle of the investing process at H&F, including sourcing ideas, negotiating transactions, raising capital, establishing governance procedures, partnering with executives to grow their businesses and ultimately selling the investments.

(Emphasis in original.)

24. Defendant Kenneth W. Alterman has served as a Company director since 2011. He is also Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Alterman owned 78,300 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Alterman owned roughly $2.14 million worth of Grocery Outlet's common stock at that time.

25. For the 2023 Fiscal Year, Defendant Alterman received $258,027 in total compensation from the Company, which was composed of $95,000 in fees earned or paid in cash, and $163,027 in stock awards.

26. The 2024 Proxy Statement stated the following with respect to Defendant Alterman:

> ***Career Highlights***
>
> Dec. 2002 to Jan. 2022, served various positions at **Savers, Inc.**, a retail thrift store chain, including as Executive Adviser (*Jan. 2017 to Jan. 2022*), President, Chief Executive Officer and a director (*Jan. 2004 to Jan. 2017*) and Vice President and General Manager (*Dec. 2002 to Dec. 2003*).
>
> Previously, for 20 years, he worked at **Pepsi Bottling Group**, most recently as Director of Bottlers Operations and Washington State Market Unit General Manager.
>
> ***Public Company Boards***
>
> None
>
> ***Other Information***
>
> He has served and continues to serve as a board member and board advisor of various private companies, including Essex Technology Group, LLC (d/b/a Bargain Hunt), a discount retailer across a wide variety of products.
>
> He received a Bachelor of Science in Chemical Engineering from Clarkson University.
>
> ***Skills and Qualifications Relevant to Service on our Board***

- Developed extensive knowledge of the discount retail industry throughout his career, including from employment and director roles.

- Focused marketing and brand management experience at Pepsi, with oversight on brand roll outs and product acquisition integration, as well as from his leadership role at Savers, which heavily focused on discount marketing.

- Possesses substantial executive management expertise, with particular experience in developing corporate strategy and assessing emerging industry trends and business operations, from his 18 years of leadership at Savers.

- Relevant supply chain and logistics experience from his responsibility for distribution of Pepsico beverages in the U.S. and Canada, as well as overseeing the global distribution of Savers products.

- Private board service and advisory roles provide relevant governance, compensation and strategic oversight experience.

(Emphasis in original.)

27. Defendant John E. Bachman has served as a Company director since 2019. He is also Chair of the Audit and Risk Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Bachman owned 15,872 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Bachman owned roughly $433,306 worth of Grocery Outlet's common stock at that time.

28. For the 2023 Fiscal Year, Defendant Bachman received $263,027 in total compensation from the Company, which was composed of $100,000 in fees earned or paid in cash, and $163,027 in stock awards.

29. The 2024 Proxy Statement stated the following with respect to Defendant Bachman:

***Career Highlights***

Since 2015, has been an outside director for various public companies since his retirement.

1978 to 2015, former Certified Public Accountant at the global accounting firm, **PricewaterhouseCoopers LLP**, most recently as a partner (*1989 to 2015*). At PwC, Mr. Bachman served for

six years (*2007 to 2013*) as the Operations Leader of the firm's U.S. Assurance Practice with full operational and financial responsibility for this $4 billion line of business, which included the firm's audit and risk management practices. Prior to this role, Mr. Bachman served for three years as the firm's U.S. Strategy Leader (*2004 to 2007*) where he was responsible for strategic planning across business units, geographies and industries. Mr. Bachman also served as an audit partner for over 25 years for companies in the industrial manufacturing, financial services, publishing, healthcare and other industries.

***Public Company Boards***

Current

None

| | |
|---|---|
| Prior<br><br>The Children's Place Inc. (*Mar. 2016 to Mar. 2024*), an omni-channel children's specialty retailer, with a global retail and wholesale network. Nasdaq: PLCE<br><br>• Audit (*Chair, May 2017 to Mar. 2024; Member, Mar. 2016 to Mar 2024*)<br><br>• Corporate Responsibility, Sustainability & Governance (f/k/a Nominating and Corporate Governance) (*2019 to 2023*) | **Recharge Acquisition Corp** (*2020 to 2022*), a blank check company (also known as a special purpose acquisition company), including as Chair of the Audit Committee and a member of the Compensation Committee. Nasdaq: RCHG<br>**Wex Inc.** (*2016 to 2021*), a global provider of payment solutions, including as a member of the Audit Committee and Finance Committee. Nasdaq: WEX<br>**SCANA Corporation** (*2018 to 2019*), an electric and natural gas utility company, including as a member of the Special Litigation Committee. NYSE: SCG |

***Other Information***

He received a Bachelor of Science in Business Administration from Bucknell University, and a Master of Business Administration from Harvard Business School.

***Skills and Qualifications Relevant to Service on our Board***

- Extensive financial and accounting expertise, as well as business strategy, internal controls, financial reporting and enterprise risk oversight experience, from serving as a partner (as a former Certified Public Accountant) and in leadership roles for one of the world's largest accounting firms. In addition, he has served as Chair of our Audit Committee since Nov. 2019, as well as the Audit Committee and Finance Committee of numerous other public companies in recent years. He has been determined by our Board to be an audit committee financial expert.

- Possesses public company director experience through his substantial board and board committee service in recent years for companies in a variety of industries, including an omnichannel retailer.

- Through many years of senior leadership at PwC, he has deep experience in operations, finance, risk management and strategic planning of a large, complex organization.

- Has retail experience through his lengthy board and board committee service to The Children's Place.

(Emphasis in original.)

30. Defendant Mary Kay Haben has served as a Company director since 2019. She is also Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Haben owned 15,872 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Haben owned roughly $433,306 worth of Grocery Outlet's common stock at that time.

31. For the 2023 Fiscal Year, Defendant Haben received $256,805 in total compensation from the Company, which was composed of $93,778 in fees earned or paid in cash, and $163,027 in stock awards.

32. The 2024 Proxy Statement stated the following with respect to Defendant Haben:

> ***Career Highlights***
>
> Since 2011, she has been an outside director for various public companies since her retirement.
>
> Apr. 2007 to Feb. 2011, she held senior positions with **Wm. Wrigley Jr. Company**, a confectionery company, including President, North America (*Oct. 2008 to Feb. 2011*) and Group Vice President and Managing Director, North America (*Apr. 2007 to Oct. 2008*). Wrigley was public until October 2008, following which it became a subsidiary of **Mars, Incorporated**.
>
> Prior, she led several multi-billion divisions during her 27-year career with **Kraft Foods, Inc.**, a grocery manufacturing and processing conglomerate, including Senior Vice President, Open Innovation (*2006 to 2007*), Senior Vice President, Global Snack Sector (*2004 to 2006*), and Group Vice President, Kraft Foods and President, Cheese, Enhancers and Meals (*2001 to* 2004).

***Public Company Boards***

| Current | Prior |
|---|---|
| **The Hershey Company** (*since Aug. 2013*), a global confectionery leader. *NYSE: HSY*<br><br>• Compensation and Human Capital Committee (*Aug. 2013 to May 2017, and since May 2018*)<br><br>• Finance and Risk Management Committee (*2018, and since 2023*)<br><br>• Governance Committee (*Chair, 2018 to 2022; Member, Jan. 2016 to 2022*)<br><br>• Executive Committee (*2018 to 2022*)<br><br>**Equity Residential** (*since July 2011*), a REIT engaged in the acquisition, development and management of multi-family properties. *NYSE: EQR*<br><br>• Compensation Committee (*Chair, since 2016; Member, since 2013*)<br><br>• Audit Committee (*2011 to 2013*)<br><br>• Corporate Governance Committee (*since 2012*) | **Bob Evans Farms, Inc.** (*Aug. 2012 to Jan. 2018*), a leading producer and distributor of food products. *Nasdaq: BOBE* (*company sold and went private in Jan. 2018*)<br><br>• Lead Independent Director (*Aug. 2015 to Jan. 2018*)<br><br>• Non-Executive Chair of the Board (*Oct. 2014 to Aug. 2015*)<br><br>• Compensation Committee (*Apr. 2015 to Jan. 2018*)<br><br>• Nominating and Corporate Governance Committee (*2016 to Jan. 2018*)<br><br>• Audit Committee (*Aug. 2012 to 2014*)<br><br>• Finance Committee (*Aug. 2012 to 2014*) |

Other Information

Ms. Haben was named to the 2020 National Association of Corporate Directors Directorship 100™, which honors the most influential boardroom leaders each year. She has served and chaired various alumni and foundation boards of the University of Michigan and Illinois, and is active in various non-profit boards.

She received a Bachelor of Science in Business Administration from the University of Illinois, and a Master of Business Administration in Marketing from the University of Michigan, Ross School of Business.

***Skills and Qualifications Relevant to Service on our Board***

- Possesses substantial M&A, operating, digital, marketing, and brand management and development experience from long-term senior executive roles for consumer-packaged goods/food companies, including a strong track record in delivering value to shareholders and consumers through brand building, developing new products, innovation and implementation of business strategies in various markets and media platforms. Has deep knowledge of and ability to analyze the overall consumer-packaged goods industry, evolving market dynamics and consumers' relationships with brands. Executive experience also included numerous years of direct reports in sales, R&D and supply chain.

- Long-tenured current board member of two public companies, and a former long-term board member of a third public company. Significant oversight expertise in governance, compensation, finance, digital transformations and AI, digital and social marketing, supply chain strategy, ESG and enterprise risk management (including cybersecurity risks) from serving on public company boards, including numerous leadership and board committee roles, since her retirement in 2011. Experience includes two significant directorships with consumer-packaged goods/food companies.

- The breadth of experience and expertise leading boards and board committees, as well as serving in executive management roles, enable her to provide critical insights in overseeing and partnering with management.

(Emphasis in original.)

33. Defendant Thomas F. Herman has served as a Company director since 2004. He is also a member of the Audit and Risk Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Herman owned 20,390 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Herman owned roughly $556,647 worth of Grocery Outlet's common stock at that time.

34. For the 2023 Fiscal Year, Defendant Herman received $263,027 in total compensation from the Company, which was composed of $100,000 in fees earned or paid in cash, and $163,027 in stock awards.

35. The 2024 Proxy Statement stated the following with respect to Defendant Herman:

***Career Highlights***

2017 to 2021, Board member of Guckenheimer, a food management company, including as chairman of the Audit Committee.

June 2003 to Jan. 2004, President and Chief Operating Officer of **Good Guys, Inc.**, a public company consumer electronics retailer.

2001 to 2003, co-founder and managing partner of **Oak Harbor Partners**, a boutique financial services firm.

Dec. 1998 to July 2001, Chief Executive Officer and President of **Employment Law Learning Technologies**, an online learning company focused on employment law.

1998 to 2001, co-founder of **The Alamo Group**, a real estate redeveloper of distressed assets.

1994 to 1998, Chief Executive Officer of **American Fashion Jewelry**, a mall-based jewelry retailer.

1989 to 1992, Chief Executive Officer of **San Francisco Music Box Co.**, a global mall-based retailer of music boxes.

1987 to 1989, Chief Executive Officer of **Grand Auto Inc.**, a public company automotive retailer.

1982 to 1987, he served in multiple roles at **Lucky Stores**, a high-growth, multi-division discount retailer that was a public company, including as Chief Executive Officer of Automotive Division (*1982 to 1985*) and Chief Administrative Officer (*1985 to 1987*)

1979 to 1982, Chief Executive Officer of **Delta California Industries Inc.**, a multi-state transportation public company.

***Public Company Boards***

| Current | Prior |
|---|---|
| None<br><br>Last Five Years<br><br>None | **Good Guys, Inc.** (*2002 to 2004*), including as Chair of Audit Committee and member of Compensation Committee. Nasdaq: GGUY<br><br>**Crdentia** (*2003 to 2006*), a provider of healthcare staffing services in the United States, including as a member of the Audit Committee. *OTC Bulletin Board* |

***Other Information***

He taught finance for 10 years in the Master of Business Administration program at St. Mary's College, among other finance teaching positions.

He received a Bachelor of Arts in Political Science from University of Oregon, and a Master of Business Administration from University of California, Berkeley.

***Skills and Qualifications Relevant to Service on our Board***

- Possesses significant executive retail experience from his long career that included numerous management positions for retail companies of significant complexity and scale, including certain high-growth companies.
- Through many years of service as Chief Executive Officer and other senior management roles, he led numerous M&A, financing, supply chain, human resources, and strategic development and repositioning matters.
- Historical public company board experience, which led to his initial appointment to our Board and continuing leadership role.
- Deep financial and accounting expertise, including serving as the chair or member of the Audit Committees of many public companies, and as the former Chair and continuing member of our Audit and Risk Committee for nine years. Further, he taught finance courses in college for many years. He has been determined by our Board to be an audit committee financial expert.

(Emphasis in original.)

36. Defendant Carey F. Jaros has served as a Company director since 2020. She is also a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Jaros owned 13,571 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Jaros owned roughly $370,488 worth of Grocery Outlet's common stock at that time.

37. For the 2023 Fiscal Year, Defendant Jaros received $248,027 in total compensation from the Company, which was composed of $85,000 in fees earned or paid in cash, and $163,027 in stock awards.

38. The 2024 Proxy Statement stated the following with respect to Defendant Jaros:

***Career Highlights***

Since Oct. 2014, she has served in various executive positions at **GOJO Industries, Inc.**, a global manufacturer of hand hygiene and surface disinfecting products and the maker of

PURELL® brand Hand Sanitizer, including as President and Chief Executive Officer (*since Jan. 2020*), Chief Operating Officer (*July 2018 to Jan. 2020*), Chief Strategy Officer (*May 2016 to July 2018*), and a member of the Board of Directors of GOJO (*since Feb. 2019*). She also served as President of the private family office for GOJO's owners, Walnut Ridge Strategic Management Company, and was a member of GOJO's Board of Directors, and a Board Director for several other portfolio companies, while in that role (*Oct. 2014 to Apr. 2016*).

From Apr. 2011 to Oct. 2014, she was employed at **Dealer Tire**, a tire and parts distributor for automotive OEMs and Dealers, as Vice President, OEM Programs (*Feb. 2014 to Oct. 2014*) and Vice President, Strategy, Business Development and Finance (*Apr. 2011 to Feb. 2014*).

June 2000 to Apr. 2011, she served in various roles at **Bain and Company**, a management consulting firm, including Senior Manager where she led consulting projects in retail and consumer products.

***Public Company Boards***

None

***Other Information***

Ms. Jaros is a past board member of ESOP ACRT Services Inc. and has been a board member and advisor to more than a half-dozen private companies, including edtech startup WISR Inc. and personal care startup Aunt Flow.

She received a Bachelor of Arts in Law & Public Policy from Brown University, and a Master of Business Administration from Harvard Business School.

***Skills and Qualifications Relevant to Service on our Board***

- Possesses substantial executive management expertise on a broad range of management topics, including developing corporate strategy, recruiting and developing a senior executive team, assessing emerging industry trends as well as optimizing business operations.

- Developed extensive knowledge as a global consumer and industrial products leader throughout her career. At GOJO, the PURELL omnichannel and consumer business directly reports to her, including sales to all U.S. retailers and through e-commerce. At Bain, she spent more than 10 years primarily advising retail, consumer products and industrial sectors, including numerous public and private companies involved in food manufacturing and production.

- Oversees direct reports leading brand and consumer marketing since 2016 at GOJO, including responsibility for the marketing organization and leadership of brand strategy matters.

- Led a massive supply chain systems redesign following the COVID pandemic, including facilities, systems and equipment, to drive high-growth by more than doubling global production in a short time across North America and Europe. Redesign and scaling the business for significantly higher demand included overseeing the implementation of significant automation technology, including a state-of-the-art material handling system for distribution operations and similar to what is used by major retailers and distributors in retail and consumer goods industries.

- Developed financial and accounting expertise through executive roles, including debt restructuring and refinancings, and previously was determined by our Board to be an audit committee financial expert during her service on our Audit and Risk Committee.

- Is a member of GOJO's sustainable value steering team, and serves as co-sponsor of GOJO's DEI team that drives its strategy.

- Private board service and advisory roles provide additional governance, compensation and strategic oversight experience.

(Emphasis in original.)

39. Defendant Gail Moody-Byrd has served as a Company director since January 2021. She is also a member of the Audit and Risk Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Moody-Byrd owned 12,811 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant Moody-Byrd owned roughly $349,740 worth of Grocery Outlet's common stock at that time.

40. For the 2023 Fiscal Year, Defendant Moody-Byrd received $253,027 in total compensation from the Company, which was composed of $90,000 in fees earned or paid in cash, and $163,027 in stock awards.

41. The 2024 Proxy Statement stated the following with respect to Defendant Moody-Byrd:

***Career Highlights***

Since March 2022, Vice President, Marketing of **LinkedIn Sales Solutions at LinkedIn Corporation**, the world's largest social professional network and a division of Microsoft Corporation.

November 2018 to February 2022, Chief Marketing Officer of **Noodle.ai**, a software company focused on AI innovation in the global supply chain industry.

September 2007 to October 2018, served various sales and marketing positions at **SAP SE**, a multinational enterprise software application company, including most recently as Vice President, Head of Web Marketing (*Jan. 2018 to Oct. 2018*), and Senior Director, Growth Strategies, Digital and Social Channels (*May 2017 to Dec. 2017*).

February 2001 to August 2007, served various marketing and corporate development positions at **Palm**, a software developer and manufacturer of smartphones for consumers and enterprises.

In prior years, she had retail industry roles with divisions of **Federated Department Stores** and **Target Corporation**, with **Levi, Strauss & Co.**, as well as retail consultant roles with **McKinsey & Company** and **Walker K. Levy Associates**.

***Public Company Boards***

None

***Other Information***

She is a seven-year member of the Board of Directors of Juma Ventures, a non-profit that strives to break the cycle of poverty for underserved youth across America.

She received a Bachelor of Arts in Economics from Spelman College, and a Master of Business Administration from Harvard Business School.

***Skills and Qualifications Relevant to Service on our Board***

- Developed significant marketing and brand management expertise, including in driving brand awareness and demand generation as well as leading technology and data-driven consumer marketing, through more than 35 years in B2B technology marketing and retail/wholesale industry consulting, merchandising and planning.

- Early career focused on retail industry matters, including serving as a retail consultant for national and global brands, as well as a merchandiser, buyer, and brand manager. At Noodle.ai, she drove brand awareness and revenue generation for a high-growth supply chain software company targeting global consumer packaged goods companies.

- Has had recent involvement in strategic planning and other executive management matters at LinkedIn, and operated as a member of the C-suite at Noodle.ai, including quarterly board meeting presentations with the private equity-led board.

- At SAP, she spent five years as the digital marketing lead for the SAP Community Network, an online loyalty community of over 2 million customers undertaking various stages of large-scale digital transformations through SAP software implementations, thereby developing familiarity with various stages of the customer experience in such projects.

(Emphasis in original.)

42. Defendant Jeffrey R. York has served as a Company director since 2010. He is also a member of the Audit and Risk Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant York owned 73,296 total shares of Grocery Outlet common stock. Since the price per share of Grocery Outlet common stock at the close of trading on April 9, 2024 was $27.30, Defendant York owned roughly $2 million worth of Grocery Outlet's common stock at that time.

43. For the 2023 Fiscal Year, Defendant York received $253,027 in total compensation from the Company, which was composed of $90,000 in fees earned or paid in cash, and $163,027 in stock awards.

44. The 2024 Proxy Statement stated the following with respect to Defendant York:

***Career Highlights***

Since June 2020, serves as Special Advisor to **Sobeys, Inc.**, the second largest food retailer in Canada with over 1,500 stores operating across Canada under a variety of names.

June 2020 to January 2024, served as Partner**, Farm Boy Stores Inc.**, a Canadian specialty grocery retailer.

Nov. 2009 to June 2020, served as Co-Chief Executive Officer and President of **Farm Boy, Inc**.

1989 to 2009, served in various roles at **Giant Tiger Stores Ltd.**, a Canadian extreme value discount store chain, including as President and Chief Operating Officer (*1999 to 2009*).

1986 to 1989, served with **Ward Mallette, Chartered Accountants**, where he obtained a chartered accountant/CPA designation.

***Public Company Boards***

None

***Other Information***

Mr. York currently serves as Chairman and a member of the Boards of Directors (and the Audit Committee) of the following Canadian public companies: Braille Energy Systems, Inc. (TSX-V: BES), a manufacturer of race car batteries and other energy storage devices; Stria Lithium (TSX-V: SRA), a junior mineral exploration company with lithium claims in Northern Quebec; and Focus Graphite (TSX-V: FMS), an advanced exploration and mining company.

He received a Bachelor of Arts in Economics from Princeton University.

***Skills and Qualifications Relevant to Service on our Board***

- Developed extensive knowledge of the grocery and food retail industries, as well as extreme value discount retail, throughout his career spanning over 30 years in these areas.
- Experienced in leading rapid growth in store count and sales evidenced by his accomplishments at both Giant Tiger Stores and Farm Boy.
- Possesses substantial executive management expertise, with particular experience in developing corporate strategy, oversight of supply chain and logistics matters for fresh food deliveries, distribution centers and business operations.
- Financial and accounting expertise through being a Canadian certified public accountant and serving on the audit committees of other boards.
- Canadian public company director roles provides relevant governance, compensation, additional financial and strategic oversight experience.

(Emphasis in original.)

## FIDUCIARY DUTIES OF THE DIRECTOR AND OFFICER DEFENDANTS

45. By virtue of their positions as officers and/or directors and/or fiduciaries of Grocery Outlet and due to their ability to control the business and corporate affairs of Grocery Outlet, the Director and Officer Defendants owed Grocery Outlet and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are mandated to use their full ability to control and manage Grocery Outlet in a fair, just, honest, and equitable way. The Director and Officer Defendants were and are mandated to act in furtherance of the best interests of Grocery Outlet and its stockholders in order to enhance all stockholders equally.

46. Each director and officer of the Company owes to Grocery Outlet and its stockholders the fiduciary duty to exercise good faith and diligence in the management of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47. The Director and Officer Defendants, by virtue of their positions of control and authority as directors and/or officers of Grocery Outlet, could and did, directly and/or indirectly, exercise control over the unlawful acts complained of herein.

48. To carry out their duties, the officers and directors of Grocery Outlet had to exercise reasonable and careful supervision over the management, policies, controls, and operations of the Company.

49. Each Individual Defendant, because of their position as a director and/or officer, owed to the Company and to its stockholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The behavior of the Director and Officer Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Grocery Outlet, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that the Director

and Officer Defendants were aware or should have been aware posed a risk of serious injury to the Company. The behavior of the Director and Officer Defendants who were also officers and directors of the Company has been ratified by the remaining Director and Officer Defendants who collectively made up the Company's Board at all relevant times.

50. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Director and Officer Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information regarding the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to compel the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of Grocery Outlet common stock would be based upon truthful and accurate information. Further, they had a duty to insure the Company complied with all applicable laws.

51. To carry out their duties, the officers and directors of the Company had to exercise reasonable and careful supervision over the management, policies, practices, and internal controls of the Company. Because of such duties, the officers and directors of Grocery Outlet had to, among other things:

(a) insure that the Company was operated in a diligent, honest, and careful manner in accordance with the laws and regulations of California and the United States, and pursuant to Grocery Outlet's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner in order to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Grocery Outlet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Grocery Outlet and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or compel independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Grocery Outlet's operations would comply with all applicable laws and Grocery Outlet's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was mandated by law to disseminate;

(g) refrain from unduly enhancing themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information regarding the financial affairs of the Company and make full and accurate disclosure of all material facts regarding, *inter alia*, each of the subjects and duties set forth *supra*.

52. Each Individual Defendant further owed to Grocery Outlet and the stockholders the duty of loyalty requiring that each favor Grocery Outlet's interest and that of its stockholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53. At all times relevant hereto, the Director and Officer Defendants were the agents of each other and of Grocery Outlet and were at all times acting within the course and scope of such agency.

54. Due to their advisory, executive, managerial, directorial, and controlling shareholder positions with Grocery Outlet, each Individual Defendant had access to adverse, nonpublic information about the Company.

55. The Director and Officer Defendants, by virtue of their positions of control and authority, could and did, directly or indirectly, exercise control over the unlawful acts complained of herein, as well as the contents of the various public statements issued by Grocery Outlet.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

56. In committing the unlawful acts alleged herein, the Director and Officer Defendants have pursued, or joined in the pursuit of, a common course of behavior, and have acted in concert with and conspired with one another in furtherance of their bad acts. The Director and Officer Defendants compelled the Company to hide the true facts as alleged herein. The Director and Officer Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57. The goal and effect of the conspiracy, scheme, and/or common course of behavior was, *inter alia*, to: (i) facilitate and disguise the Director and Officer Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) hide adverse information regarding the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

58. The Director and Officer Defendants accomplished their conspiracy, scheme, and/or common course of behavior by compelling the Company purposefully or recklessly to hide material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this scheme, conspiracy, and course of behavior, the Director and Officer Defendants individually and collectively took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each Individual Defendant who is or was a director of Grocery Outlet was a direct, necessary, and substantial participant in the conspiracy, scheme, and/or common course of behavior complained of herein.

59. Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the bad acts complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary bad acts, either took direct part in, or substantially assisted in the accomplishment of those bad acts, and was or should have been aware of his or her overall contribution to and furtherance of the bad acts.

60. At all times relevant hereto, each Individual Defendant was the agent of each of the other Director and Officer Defendants and of Grocery Outlet and was at all times acting within the course and scope of such agency.

## GROCERY OUTLET'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

***Grocery Outlet's Code of Business Conduct and Ethics***

61. Grocery Outlet's Code of Business Conduct and Ethics (the "Code of Conduct") states, in part:

> **Integrity and adherence to the highest ethical standards are critical to the Company's reputation and success.** Our reputation needs to be managed and developed in carrying out the business of the Company, including with investors, developers, dealers, suppliers, independent operators, vendors, strategic partners, customers regulatory officials, community leaders, the press, landlords, the general public, fellow employees and other third parties. **It is essential that all of your dealings be legal, above reproach, consistent with the Company's policies and aligned with the highest standards of business ethics.**
>
> **You should report in accordance with this Code any activity that may be, or may have the appearance of being, unethical, illegal or otherwise inappropriate.** In so doing, not only can we take

> appropriate disciplinary or legal action, but we may be able to take steps to prevent or remediate the situation that gives rise to the questioned activity.

(Emphasis added.)

62. Under the heading "Conflict of Interest," the Code of Conduct states, in relevant part, that:

> In short, you cannot be influenced by improper personal considerations that might consciously or unconsciously affect your judgment regarding the best interests of the Company. If you become aware of an actual or apparent conflict of interest, you should discuss it with the appropriate manager and disclose it to the General Counsel.

63. Under the heading "Accuracy of the Company's Records," the Code of Conduct states that:

> **All official records reflecting the performance (financial or otherwise) and conduct of the Company's business must be accurate and complete in all material respects. All those involved in the preparation of such materials should consider the accuracy of the records of critical importance**, and should understand that the Company does not maintain, nor does it tolerate, any off-the-books funds for any purposes. **It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, regulations and rules. All books and records of the Company shall be kept in such a way as to fully and fairly reflect all Company transactions in accordance with generally accepted accounting principles. As a public company, the Company adheres to the requirements of the U.S. securities laws and The NASDAQ Stock Market LLC. The Company is required by law to file certain reports and make certain disclosures. All Company personnel should take steps to ensure full, fair, accurate, timely and understandable disclosure in all reports and documents filed with the Securities and Exchange Commission (the "SEC") or any other governmental or regulatory agency and in other public communications made by the Company.**

(Emphasis added.)

64. In violation of the Code of Conduct, the Director and Officer Defendants (as key officers and members of the Company's Board) failed to prevent the Company from issuing materially false and misleading statements to the public, facilitated and disguised the Individual Defendant's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Code of Conduct, the Director and Officer Defendants failed to comply with laws

and regulations and conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

***Grocery Outlet's Audit and Risk Committee Charter***

65. The Audit and Risk Committee Charter states that the purpose of the Audit and Risk Committee is as follows:

> A. Provide assistance to the Board of Directors (the "Board of Directors") of Grocery Outlet Holding Corp. (the "Company") with respect to its oversight of:
>
> (i) The quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting processes;
>
> (ii) The Company's compliance with legal and regulatory requirements related to financial reporting and internal controls;
>
> .
> .
> .
>
> (v) **The risk management policies and procedures of the Company**; and
>
> (vi) The performance of the Company's internal audit function.
>
> The Committee's responsibility is one of oversight. The Company's management is responsible for the Company's internal control over financial reporting and disclosure controls and procedures, the preparation and the integrity of the Company's financial statements and related notes, and accounting and financial reporting principles. The independent registered public accounting firm is responsible for auditing those financial statements and internal controls in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB"). The Committee is not providing any expert or special assurance or certification as to the activities of management or the independent registered public accounting firm.
>
> B. Prepare the Committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

(Emphasis added.)

66. Under the section titled "Responsibilities and Duties," the Audit and Risk Committee Charter states, in relevant part:

The following functions shall be the common recurring activities of the Committee in carrying out its responsibilities. These functions should serve as a guide with the understanding that the Committee may carry out additional functions and adopt additional policies and procedures as may be required or appropriate in light of changing business, legislative, regulatory, legal or other conditions. **The Committee shall also carry out any other responsibilities and duties delegated to it by the Board of Directors from time to time and have such powers as may be necessary or appropriate in the efficient and lawful discharge of its responsibilities.**

.

.

.

<u>Documents/Reports Review</u>

**1. Review and discuss with management and the independent registered public accounting firm, prior to public dissemination, the Company's annual audited financial statements and quarterly unaudited financial statements and related notes, the reports of the independent registered public accounting firm on the annual audited financial statements and internal control over financial reporting, and the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's SEC filings.**

**2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time.**

**3. Review and discuss with management and, if appropriate, the independent registered public accounting firm the Company's earnings press releases (including non-GAAP financial measures), as well as financial information and earnings guidance provided to stockholders, analysts and rating agencies.** The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide financial information and earnings guidance.

**4. Review and discuss with management and the independent registered public accounting firm any significant issues (including any significant deficiencies or material weaknesses) arising as to the adequacy or effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures (including management's reports thereon), any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.**

.

.

.

Financial Reporting Process

**12. In consultation with the independent registered public accounting firm, management and the internal auditors, review the integrity of the Company's financial reporting processes.** In furtherance thereof, the Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

(i) all critical accounting policies and practices to be used by the Company;
(ii) critical audit matters as determined by the independent registered public accounting firm;
(iii) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm;
(iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and
(v) any other material written communications between the independent registered public accounting firm and the Company's management such as any management letter or schedule of unadjusted differences.

.
.
.

Internal Audit

**15. Review the appointment and replacement (if applicable) of the leader of the internal audit function.**

16. Review the significant reports to management prepared by the internal audit function and management's responses.
.
.
.

20. Investigate or oversee the investigation undertaken by or on behalf of the Company regarding the possible violations of the Company's corporate compliance program and **report the results and recommendations to the Board of Directors.**

21. R**eview the annual enterprise risk management assessment**, which considers strategic, operational, compliance and financial risks across the organization, with management, the leader of the internal audit function, and, as necessary, the independent registered public accounting firm; such review shall include oversight of the framework, quality and effectiveness of the enterprise risk

> management process, the Company's policies for monitoring, assessment, prioritization and management of risks, and the steps management has taken to monitor and mitigate such risks.
>
> 22. **As part of the Company's enterprise risk management process, the Committee shall oversee certain identified risks relating to financial risks** (including liquidity, legal, regulatory and other contingencies) . . .
>
> .
> .
> .
>
> Committee Reports
>
> 28. Based on discussions with the independent registered public accounting firm and management, determine whether to recommend to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last completed fiscal year for filing with the SEC.
>
> 29. Prepare the Committee report required by the SEC to be included in the Company's annual proxy statement, which shall disclose, among other things, its prior recommendation to the Board of Directors whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the last completed fiscal year for filing with the SEC.
>
> 30. Report regularly to the Board of Directors including:
>
> (i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements impacting the financial statements or internal controls, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;
>
> (ii) periodically following meetings of the Committee; and
>
> (iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.
>
> The Committee shall provide such recommendations to the Board of Directors as the Committee may deem appropriate. The reports to the Board of Directors may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make such report.

(Emphasis added.)

67. In violation of the Audit and Risk Committee Charter, the Director and Officer Defendants comprising the Audit and Risk Committee (as key members of the Company's Board) compelled the Company to issue materially false and misleading statements to the public, facilitated

and disguised the Director and Officer Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and aiding and abetting thereof. Also, in violation of the Audit and Risk Committee Charter, the Director and Officer Defendants failed to implement risk assessment and risk management protocol and failed to insure the Company's compliance with applicable law.

**DIRECTOR AND OFFICER DEFENDANTS' MISCONDUCT**

**Background**

68. Grocery Outlet describes itself as "a high-growth, extreme value retailer of quality, name-brand consumables and fresh products sold through a network of independently owned and operated stores." There are over 400 Grocery Outlet stores throughout the U.S.

69. Grocery Outlet stores are independently operated and can be found in California, Idaho, Maryland, Nevada, New Jersey, Ohio, Oregon, Pennsylvania, and Washington.

**Materially False and Misleading Statements Issued During the Relevant Period**

70. The Relevant Period begins on November 7, 2023. On that day, Grocery Outlet held an earnings conference call related to the third quarter of its 2023 Fiscal Year ("Q3 2023 Earnings Call"). Defendants Sheedy (the CEO at the time) and Bracher (the CFO at the time) were the representatives from Grocery Outlet who spoke on the call. Both spoke in depth about Grocery Outlet's transition from one set of systems to another (the "Systems Transition"). In discussing the Systems Transition, Defendant Sheedy stated:

> While pleased with our third quarter performance, **we experienced operational disruptions as we transition to upgraded systems.** On prior calls, we have discussed our approach and history of investing in modernizing systems to improve capabilities and drive efficiency. **We began to implement our most recent enhancements in late August, which include upgrades to product, inventory, financial and reporting platforms.**
>
> **One important component of this upgrade is a new store portal that will provide operators with improved data to make better**

> **purchasing, merchandising and marketing decisions. We are excited for the improved functionality, scalability and data analytics that this and other enhancements will provide.**
>
> **The transition to these new systems has resulted in ordering and inventory disruptions that have impacted third quarter and fou**rth quarter results. We have been partnering closely with our independent operators to minimize the impact to customers and sales.
>
> **We have also elected to provide commission support to our operators as we continue to make steady progress adapting to the new systems. We anticipate the transitional impact to be largely behind us by the end of the year.** Charles will provide more details in his commentary.

(Emphasis added.)

71. During the Q3 2023 Earnings Call, Defendant Bracher said of the Systems Transition:

> **Our third quarter results reflect the continued momentum we are seeing in our business, which drove strong comparable store sales growth and margin expansion.**
>
> **For the quarter, net sales increased 9.3% to $1 billion, primarily due to a 6.4% increase in comparable store sales and the impact of new stores opened over the past 12 months. Our system upgrades impacted comparable store sales by an estimated 150 basis points as comps were running in the high single digits before the transition.**
>
> .
> .
> .
>
> Now let me provide some commentary on our expectations for the fourth quarter and update our outlook for the full year. **While our underlying business remains strong, we do expect the system transition to significantly impact financial results in the fourth quarter and to a greater degree than the third quarter, given the additional months affected.**
>
> .
> .
> .
>
> In closing, I would like to take a moment to thank our incredible team of independent operators and employees for continuing to execute at a high level on behalf of our customers. **Our underlying business remains strong and we are making important investments to further strengthen our value proposition and position us for long-term growth.**

(Emphasis added.)

72. Further along in the Q3 2023 Earnings Call, in response to a question from Goldman Sachs about the Systems Transition, Defendant Sheedy stated, in part:

> **We did upgrade a number of systems at the end of August, inclusive of product inventory, financial and reporting platforms.**
>
> **These upgrades include replacement of our AS400 system, which is our legacy ERP system with SAP, along with other third-party plus some new proprietary applications for buying in store operations. So that was the enhancement that was implemented back a couple of months ago.**
>
> **It's the continuation of prior ERP upgrades that we have implemented over the past eight years to 10 years and consistent with the approach that we have talked about in making ongoing investments in modernizing our systems to build foundation for future growth and scalability of the business model.**
>
> As far as benefits, you asked about data and analytics, we really look forward to the enhancements that these new platforms will provide. They will give us new capabilities for how we manage the business, they will drive efficiencies through better data and analytics that will support us with better decision-making and that will be an improvement, enhancement for both the operator community as well for Grocery Outlet in total.
>
> **In terms of the challenges and the disruption that we face as we transition to the new systems, we were challenged with inventory visibility and the impact here was on ordering and inventory management in general, and unfortunately, this disruption did have an impact throughout the business and the P&L.**
>
> And notably, as mentioned in our comments, topline sales were impacted by lighter inventory levels, slightly lower variety. We had some pressure on margin as it relates to inventory inefficiencies and then SG&A was higher as well as we elected to provide operators with support.
>
> **I will say that we did expect some disruption during this transition. It was factored into our previous guidance, just not to the degree that we have been experiencing it, and of course, we are very disappointed with the magnitude of it and we own it, we own where we are.**
>
> **And at this point, we have addressed the inventory visibility issues, along with other issues we experienced earlier on. So we have made very good progress there. We have also recently returned to more normalized store ordering practices. We have much healthier warehouse inventory levels and flow throughout the system. So we are feeling good about all of that.**
>
> I will also say that we are still adapting to other parts of the new systems. We were working through some of these new processes and working our way back to what I would describe as more optimal inventory levels and margin management, and therefore, the impact that we anticipate throughout the fourth quarter here.

> **Nevertheless, we are making good daily progress, and as I mentioned, we do anticipate the transitional impacts to be largely behind us as we get to the end of the year.** And I will kick it over to Charles now to comment on 2024.

(Emphasis added.)

73. Defendant Bracher added to Defendants Sheedy's answer thusly:

> So as it relates to the third quarter, again, think of this as being one month of impact to the fiscal quarter.
> And so as [Sheedy] mentioned, we felt both the topline and a margin impact in Q3, along with elective commission support. You see the same impacts in the fourth quarter, just to a greater degree as we are feeling the kind of full three-month impact, if you will, in the fourth quarter.
>
> **We do expect that as we -- over the course of the fourth quarter, all of those impacts moderate and as disappointed as we are with the magnitude of the impact in the fourth quarter, we do expect and believe that it will be largely behind us by the end of the year.** And so, our view at this point is, we will enter the new year without any lingering cost impacts or otherwise related to the transition.

(Emphasis added.)

74. In a December 11, 2023 press release titled "Grocery Outlet Holding Corp. Announces CFO Transition and Reaffirms Fourth Quarter Outlook and Fiscal 2023 Guidance," Grocery Outlet announced that Defendant Bracher informed the Company that he intended to resign effective March 1, 2024.

75. The press release also stated that Grocery Outlet was reaffirming its Q3 2023 Earnings Call guidance.

76. In a February 27, 2024 press release titled "Grocery Outlet Holding Corp. Announces Fourth Quarter and Fiscal 2023 Financial Results," the Company stated the following regarding the Systems Transition:

> As previously disclosed, the Company experienced disruptions as a result of the implementation of new technology platforms in late August 2023. Such disruptions are estimated to have negatively impacted comparable store sales by approximately 200 basis points and gross margin by 130 basis points in the fourth quarter.
> .
> .
> .

> Disruptions as a result of the implementation of the new technology platforms in late August 2023 are estimated to have negatively impacted comparable store sales by approximately 90 basis points and gross margin by 50 basis points in fiscal 2023.

77. On the same day as the press release, Grocery Outlet held an earnings conference call related to its Fourth Quarter and 2023 Fiscal Year ("Q4 2023 Earnings Call"). Defendant Sheedy discussed the Company generally and the Systems Transition specifically:

> Good afternoon, everyone, and thank you for joining us. We are happy to be speaking to you today about our business results, acquisition of United Grocery Outlet, and outlook for 2024. Let me start by providing some commentary on business performance and notable growth initiatives over the next few years. **First, our fourth-quarter results were slightly ahead of our expectations, and traffic and customer acquisition remained strong. We continue to deliver unbeatable value with an exciting treasure hunt experience, and our underlying business fundamentals remain healthy.**
>
> .
> .
> .
>
> **Fourth-quarter sales increased 6.3%, driven by a 2.7% increase in comparable store sales, which was ahead of our expectations.**
>
> .
> .
> .
>
> Fourth-quarter gross margin was also ahead of our expectations at 30.2%. The closeout market remains strong, and our growing size and scale provide increasing access to products with strong customer value and healthy margin. We opened 13 new stores in the fourth quarter, including our first store in Ohio, ending the year with 468 locations.
>
> Recent vintages continue to ramp well, and we are pleased with new store performance. **We have made steady progress with our systems implementation work though data integration efforts are taking longer than expected and are still impacting our business results. The largest remaining issues are related to warehouse product expiry data and store-level reporting for IOs. We expect these to be resolved soon, after which the P&L impact will be behind us.** Charles will provide more details in his comments.
>
> **Despite the systems disruption, business fundamentals are healthy and our new applications are supporting daily operations well.** We are proud to have delivered strong results during 2023, growing sales by 11% to a record $4 billion. This was driven by comp store sales growth of 7.5% and a customer count increase of 8.3%. We also leveraged gross profit by 76 basis points and grew adjusted EBITDA by 18%.

(Emphasis added.)

78. During the Q4 2023 Earnings Call, Defendant Bracher said of the Company generally and the Systems Transition specifically:

> **Our fourth-quarter results slightly exceeded our expectations, reflecting continued strength in transaction growth, which improved throughout the quarter.** For fiscal 2023 in total, we delivered strong top-line growth with comp sales increasing 7.5%, yielding $4 billion in total sales. We also drove healthy bottom-line growth with adjusted EBITDA of 17.7% and adjusted net income increasing 15.2%.
>
> For the quarter, net sales increased 6.3% to $989.8 million due to a 2.7% increase in comparable store sales and the impact of new stores opened over the past 12 months. Comp transaction growth of 7.5% was partially offset by a 4.5% decline in our average basket. **We estimate the system transition impacted comp sales by approximately 200 basis points for the quarter.** We opened 13 new stores during the quarter, including seven in the east and one in Southern California, and ended the year with 468 locations. We remain pleased with the performance of our new stores, which are ramping in line with our expectations. Gross profit increased 6.3% to $298.9 million, representing a 30.2% gross margin rate, slightly better than our expectations.
>
> We continue to experience healthy deal flow, which helped offset the margin impact of our system integration, which we estimate was approximately 130 basis points in the quarter.
>
> .
> .
> .
>
> For fiscal 2023, we generated $303.5 million of operating cash flow, and we invested $175.6 million in capex, net of tenant improvement allowances. **This was higher than initially planned due to the timing of payments for new stores and costs related to our systems implementation.** Now, let me provide you with some commentary on our fiscal 2024 guidance, which includes the impacts of the United Grocery Outlet acquisition and the system transition.
>
> We expect the acquisition to close at the beginning of the second quarter. Our first-quarter guidance assumes no financial impact from the acquisition, and our full-year guidance assumes nine months of financial results from United Grocery Outlet. As a result, our fiscal 2024 guidance assumes incremental sales of approximately $125 million, adjusted EBITDA of $7 million, and a modest benefit to adjusted EPS. **With respect to our system transition, while we have made progress, the data integration efforts have taken longer than anticipated. Because of this, we expect we'll continue to experience P&L impacts during the first quarter.** With that as background, let me provide you with our expectations for fiscal 2024.
>
> For the full year, we are projecting comp sales growth in the range of 3% to 4%. **We expect comp growth in the first quarter to be approximately 2%, which includes an estimated 50-basis-point impact from the system transition.** We expect to add a total of 55 to 60 net new stores this year.

> .
> .
> .
>
> For the full fiscal year, we project gross margin of approximately 31.3%. **We expect gross margin for the first quarter of approximately 30.4%, which includes an estimated 100-basis-point impact from the system transition.** We expect sequential improvement in gross margins into the back half of the year.

(Emphasis added.)

79. The next day, on February 28, 2024, Grocery Outlet filed its Form 10-K for the Fiscal Year Ended December 30, 2023 (the "2023 10-K"). The Company stated the following in its 2023 10-K with respect to the Systems Transition:

> Our information systems provide a broad range of business process assistance and real-time data to support our purchasing and planning approach, merchandising team and strategy, multiple distribution center management, store and operational insight and financial reporting. We selected and developed these technologies to provide the flexibility and functionality to support our unique buying and selling model as well as to identify and respond to merchandising and operating trends in our business.
>
> The ongoing modernization, enhancement and maintenance of our information systems have allowed us to support the growth in our business and store base. We have modernized and added several systems that provide us additional functionality and scalability in order to better support operational decision-making, including enhanced point of sale, warehouse management, human resource planning, business intelligence, vendor tracking and lead management, store communications, real estate lease management and financial planning and analysis systems.
>
> We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to enhanced systems; integrating new service providers; and adding enhanced new functionality, such as cloud computing technologies. In addition, we have a customized enterprise resource planning system, components of which have been replaced over the past several years, including our financial ledger, inventory management platform and product data warehouse system, which were replaced in late August 2023. As previously disclosed, the implementation of these system upgrades resulted in ordering and inventory disruptions, which impacted our results of operations during the remainder of fiscal 2023. We also will continue to identify and implement productivity improvements through both operational initiatives and system enhancements, such as category assortment optimization, improved inventory management tools and greater purchasing specialization.
>
> .
> .
> .

We rely on our distribution, transportation and technology network and systems to provide goods to our distribution centers and stores in a timely and cost-effective manner. Our stores are highly dependent on the successful operations of our distribution, transportation and technology networks, as IOs use these systems to order multiple deliveries per week and many of our products have a limited shelf life from the time of purchase, particularly opportunistic buys and fresh foods. Deliveries to our stores occur from our distribution centers or directly from our suppliers. We use three primary leased distribution centers that we operate and five primary distribution centers operated by third-parties. Any disruption, unanticipated or unusual expense or operational failure related to these processes and systems could affect store operations negatively. For example, during fiscal 2023 we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in ordering and inventory disruptions beginning in late August 2023, which resulted in reduced net sales and gross margin.

.
.
.

We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to global systems; integrating new service providers; and adding enhanced or new functionality, such as cloud computing technologies. In late August 2023, we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in more than anticipated ordering and inventory disruptions during the remainder of fiscal 2023. These disruptions are estimated to have negatively impacted comparable store sales by approximately 90 basis points and gross margin by 50 basis points in fiscal 2023.

.
.
.

We modify, update and replace our systems and infrastructure from time to time, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; converting to global systems; integrating new service providers; and adding enhanced or new functionality, such as cloud computing technologies. In late August 2023, we replaced components of our enterprise resource planning system, including our financial ledger, inventory management platform and product data warehouse system. The implementation of these system upgrades resulted in more than anticipated ordering and inventory disruptions during the remainder of fiscal 2023. These disruptions are estimated to have negatively impacted comparable store sales by approximately 90 basis points and gross margin by 50 basis points in fiscal 2023.

.
.
.

> Further, the time and resources required to implement or optimize the benefits of new technology initiatives, or potential issues that arise in implementing such initiatives, could reduce the efficiency of our operations in the short term. The efficient operation and successful growth of our business depends upon our information systems, including our ability to operate, maintain and develop them effectively. A failure of those systems could disrupt our business, subject us to liability, damage our reputation, or otherwise impact our financial results.
>
> .
>
> .
>
> .
>
> The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined by Rule 13a-15(f) of the Exchange Act. The Company's management conducted an assessment of the Company's internal control over financial reporting based on the framework established by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control - Integrated Framework (2013). In connection with this assessment, the Company's management identified deficiencies in the design and operating effectiveness of controls in its internal control over financial reporting related to certain information technology general computer controls ("ITGC's"). The replacement of components of our enterprise resource planning system in late August 2023 led to a significant increase in the volume of transactions across user access, program change management, and IT operations for which our existing controls were not designed to address. As a result, certain of the Company's related business controls that are dependent upon the affected ITGC's were also deemed ineffective. We did not identify any misstatements to the consolidated financial statements as of and for the year ended December 30, 2023 because of these control deficiencies. However, the pervasive impact of these control deficiencies to the Company's internal control over financial reporting created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis. Therefore, we concluded that the deficiencies represent a material weakness in our internal control over financial reporting and, as such, our internal control over financial reporting was not effective as of December 30, 2023.

80. The statements set forth *supra* were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In fact, Defendants were not equipped to effectively implement and transition the new systems in a timely manner. As a result, Defendants' positive statements regarding the Systems Transition were materially misleading and/or lacked a reasonable basis.

**THE TRUTH EMERGES**

81. Investors began to learn the truth on May 7, 2024, when Grocery Outlet issued a press release, which was also filed with the SEC on Form 8-K (the "May 7, 2024 8-K"), in which Defendant Sheedy is quoted as stating: "Despite progress with our systems transition and ending the operator commission support program, as planned, we are disappointed that additional systems conversion issues resulted in a higher than expected adverse profit impact. Our long term growth potential remains intact and we look forward to returning to more normalized business results as we near the end of our systems transition."

82. The press release from the May 7, 2024 8-K further listed the following "Highlights for First Quarter Fiscal 2024 as compared to First Quarter Fiscal 2023":

> - Gross margin decreased by 180 basis points to 29.3%. As previously disclosed, the Company experienced disruptions as a result of the implementation of new technology platforms in late August 2023. Such disruptions are estimated to have negatively impacted gross margin by 210 basis points in the first quarter.
> - Selling, general and administrative expenses increased by 13.3% to $303.4 million, or 29.3% of net sales. This includes $12.4 million of commission support we elected to provide our operators in connection with our system upgrades.
> - Net loss was $1.0 million, or $(0.01) per share.
> - Adjusted EBITDA[] decreased by 37.5% to $39.4 million, or 3.8% of net sales.
> - Adjusted net income[] decreased by 67.4% to $8.8 million, or $0.09 per adjusted diluted share[].

83. On the same day as the press release and its May 7, 2024 8-K, Grocery Outlet held an earnings conference call related to its First Quarter of the 2024 Fiscal Year ("Q1 2024 Earnings Call"). Defendant Sheedy discussed the Company generally and the Systems Transition specifically:

> Our low first quarter margins were the result of both expected and unexpected impacts from our systems transition. We've made good progress since our last call, resolving known issues, and have ended the IO commission support program as planned. However, our results were incrementally impacted by unforeseen systems transition costs that surfaced at the end of the quarter. We are all very disappointed with our poor Q1 results, and we are committed to getting these system impacts behind us very soon.
>
> .

.
.

First-quarter gross margin of 29.3% was 110 basis points below our expectations and includes approximately 210 basis points of impact from our systems transition issues. In late August, we upgraded our product, inventory, financial, and reporting platforms. This transition has disrupted our business operationally and financially over the past eight months as we discussed on our last two calls.

In February, there were two large remaining system issues impacting profit. One was related to warehouse product expiry data and the other related to store-level reporting. We have since resolved both of these and the negative impact to first-quarter gross margin came in as expected at about 100 basis points. We've reduced warehouse shrink close to normal levels with better data visibility and accurate store-level reporting enabled us to end the commission support program in March.

Lindsay will speak later about some residual expense from the commission support program that will extend through the end of the second quarter. While we are encouraged by this progress, we are disappointed that we did not foresee the additional 110 basis points of margin impact. This was quantified during catch-up invoice processing and final margin reconciliation at the end of the quarter. Delayed payment processes during Q1, combined with poor data visibility, contributed to this miss versus guidance.

We are disappointed by this as it is below our performance and forecasting standards. We have recently improved our payables process in the new system and have also increased our data visibility. Both of these improvements will enable us to manage the business back to historical margin levels and forecast with the same consistency as we did before. We continue to work through remaining system functionality and performance enhancements under the leadership of our new COO, Ramesh Chikkala.

.
.
.

Now, on to guidance. Forecasting has been difficult during the system transition as we have not had good visibility to our normal business reporting and tools. Compounding this have been data integration issues and new processes that we and our operators are adapting to within new applications.

Our guidance takes us into consideration as we complete final stages of our stabilization work. Our fiscal 2024 guidance continues to assume incremental sales of approximately $125 million, adjusted EBITDA of $7 million, and a modest benefit to adjusted EPS from the acquisition of UGO. For the full year, we are now projecting comp sales growth in the range of 3.5% to 4.5%, up from 3% to 4% to reflect better-than-expected first-quarter sales. We expect comp growth in the second quarter to be approximately 3.2%, which reflects 100 basis points Easter shift out of Q2 into Q1.

We now expect to add a total of 58 to 62 net new stores this year, up from 55 to 60. This includes the 40 newly acquired United Grocery

> Outlet stores as well as 18 to 22 new Grocery Outlet stores. In total, we continue to project fiscal 2024 net sales of $4.3 billion to $4.35 billion. For the full fiscal year, we now project gross margin of approximately 30.5%.
>
> **We expect gross margin for the second quarter of approximately 30%, which includes an estimated 100 basis point impact from the systems transition. This is due to residual expense from our commission support program as we finish store physical inventory counts in the second quarter.** We expect gross margins to increase sequentially in the back half of the year.

(Emphasis added.)

84. The investing public was dismayed by Grocery Outlet's disclosures. Investors and analysts reacted at once to Grocery Outlet's revelation. The price of Grocery Outlet's common stock declined precipitously. From a closing market price of $25.90 per share on May 7, 2024, Grocery Outlet's stock price fell to $20.88 per share on May 8, 2024, a decrease of around 19.38% in one day.

**GROCERY OUTLET ISSUES FALSE AND MISLEADING PROXY STATEMENTS**

85. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, specifically the 2024 Proxy Statement, that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

86. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy Statement before it was filed with the SEC and disseminated to Grocery Outlet's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy Statement. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2024 Proxy Statement allegations and related claims.

87. In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the 2024 Proxy Statement, which stated:

> • Responsible for oversight of sustainability, and risks and opportunities related to ESG
>
> ***Enterprise Risk Management Process***. Our Audit and Risk Committee oversees our approach to enterprise risk management, which is designed to work across our business to identify, assess, govern and manage risks (including all strategic, operational, compliance and financial risks across the organization) and our response to those risks. The Senior Director of Corporate Internal Audit & Enterprise Risk, who reports functionally and administratively to our Chief Financial Officer and directly to the Audit and Risk Committee, leads an annual risk assessment process. Through this process, risks are identified through a series of interviews and questionnaires, and then prioritized based on quantitative and qualitative factors that consider the likelihood and impact of the risk on our operations, current objectives and long-term strategies. Senior management aligns on critical risks and then identifies risk owners among the executive leadership team and a Board or a Committee for oversight. Less critical risks are subject to various levels of internal monitoring. Overall results are reported to and discussed with the Audit and Risk Committee annually and more frequently based on the materiality of specified risks. The Audit and Risk Committee provides updates to the Board, at least annually, on such review.

88. The 2024 Proxy Statement thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the actual status of Grocery Outlet's transition to new and upgraded systems; notably, that the Company was either not truly ready to timely and effectively carry out the transition or otherwise failed to disclose the potential for significant obstacles to Grocery Outlet's profitability as a result of delays and implementation issues which affected the Company's performance.

89. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

## DAMAGES TO GROCERY OUTLET

90. As a direct and proximate result of the Director and Officer Defendants' bad acts, Grocery Outlet has lost and spent, and will continue to lose and spend, many millions of dollars.

91. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

92. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against Grocery Outlet or the Director and Officer Defendants based on the bad acts alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

93. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against Grocery Outlet due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

94. Further, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Director and Officer Defendants who breached their fiduciary duties to Grocery Outlet.

95. As a direct and proximate result of the Director and Officer Defendants' behavior, Grocery Outlet has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will hinder the Company's stock in the future due to the Company's misrepresentations and the Director and Officer Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

96. Plaintiff brings this action derivatively in the right and for the benefit of Grocery Outlet to redress injuries suffered by Grocery Outlet as a direct result of the Defendants' breaches of fiduciary duty. Grocery Outlet is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97. Plaintiff will adequately and fairly represent the interests of Grocery Outlet in enforcing and prosecuting the Company's rights.

98. Plaintiff was a stockholder of Grocery Outlet at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Grocery Outlet stockholder.

## DEMAND FUTILITY ALLEGATIONS

99. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth above as though fully set forth herein.

100. The Grocery Outlet Board currently has 10 members, nine of whom are Defendants in this action: Lindberg, Ragatz, Alterman, Bachman, Haben, Herman, Jaros, Moody-Byrd, and York.

101. Plaintiff has not made any demand on Grocery Outlet's current Board to institute this action against the Director and Officer Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### A. The Director and Officer Defendants Lack Independence Because They Face a Substantial Likelihood of Liability

102. The Director and Officer Defendants face a substantial likelihood of liability for their individual misconduct. As alleged *supra*, the Director Defendants breached their fiduciary duties by negligently issuing the materially false and misleading 2024 Proxy Statement soliciting the reelection of themselves to the Board. Accordingly, the Director Defendants face a substantial likelihood of negligence liability for issuing the 2024 Proxy Statement and any demand upon these defendants is therefore futile.

103. The Director Defendants face a substantial likelihood of liability for their individual misconduct. As alleged above, the Director Defendants breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public

statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

104. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Grocery Outlet.

105. The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Grocery Outlet to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to the Director Defendants.

**B. Defendants Bachman, Herman, Moody-Byrd, and York are not Disinterested Because They Were Members of the Committee Responsible for Overseeing Financial Reporting**

106. The Audit and Risk Committee is responsible for overseeing the Company's financial reporting and compliance. One of the Audit Committee's responsibilities is to discuss earnings press releases, earnings guidance, and the Company's annual and quarterly financial statements. The Audit and Risk Committee was thus responsible for reviewing and approving

Grocery Outlet's Forms 10-Q and 10-K filed between November 7, 2023 and May 7, 2024. Defendants Bachman, Herman, Moody-Byrd, and York were members of the Audit and Risk Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Bachman, Herman, Moody-Byrd, and York caused the Company to make improper statements. Accordingly, Defendants Bachman, Herman, Moody-Byrd, and York breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

107. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

**C. Defendants Sheedy, Lindberg, and Herman are not Independent**

108. Defendant Sheedy was an executive officer of Grocery Outlet. Defendant Sheedy received compensation of $9.5 million in 2024 and $6.2 million in 2023. Defendant Sheedy depended on Grocery Outlet for his income. In addition, Grocery Outlet stated in the 2024 Proxy Statement that Defendant Sheedy was not independent pursuant to Nasdaq rules. Recently, Grocery Outlet stated in the Schedule 14A the Company filed with the SEC on April 3, 2025 (the "2025 Proxy Statement") that Defendant Sheedy continues to receive severance benefits from the Company.

109. Defendants Sheedy, Lindberg, and Herman sold shares of Grocery Outlet stock while in the possession of material nonpublic information concerning the actual status of Grocery Outlet's transition to new and upgraded systems; notably, that the Company was either not truly ready to timely and effectively carry out the transition or otherwise failed to disclose the potential for significant obstacles to Grocery Outlet's profitability as a result of delays and implementation issues

which affected the Company's performance. Defendant Sheedy sold 26,262 shares during the Relevant Period, earning more than $683,000 in proceeds. Defendant Lindberg sold 450,672 shares, earning more than $11.83 million in proceeds. And Defendant Herman sold 7,000 shares, earning proceeds of $204,000.

**D. The Director Defendants are not Independent**

110. All of the Director Defendants received and most continue to receive substantial compensation for their roles as Company directors. In addition, most Director Defendants solicited the false and misleading 2024 Proxy Statement, which led to the re-election of the Director Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, too, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

111. Therefore, for all of the reasons set forth *supra*, none of the Directors can consider a demand with disinterestedness and independence. Thus, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against the Director and Officer Defendants)

112. Plaintiff incorporates each allegation set forth above as if fully set forth herein.

113. Each of the Director and Officer Defendants owed and owes Grocery Outlet the highest obligations of loyalty, good faith, due care, and oversight.

114. Each of the Director and Officer Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, and oversight to the Company's shareholders.

115. As a direct and proximate result of the breaches of duty alleged herein, Grocery Outlet has sustained and will sustain significant damages.

116. As a result of the misconduct alleged herein, these Director and Officer Defendants are liable to the Company.

117. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

**COUNT II**
**Unjust Enrichment**
**(Derivatively Against the Director and Officer Defendants)**

118. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

119. By their unlawful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or compelled to be made, the Director and Officer Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

120. The Director and Officer Defendants either benefitted financially from the improper behavior, or received bonuses, stock options, or similar compensation from Grocery Outlet that was tied to the performance or artificially inflated valuation of Grocery Outlet, or received compensation or other payments that were unjust in light of the Director and Officer Defendants' bad faith behavior. This includes lavish compensation, benefits, and other payments provided to the Director and Officer Defendants who breached their fiduciary duties to Grocery Outlet.

121. Plaintiff, as a stockholder and representative of Grocery Outlet, seeks restitution from the Director and Officer Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Director and Officer Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Director and Officer Defendants due to their unlawful behavior and breach of their fiduciary and contractual duties.

122. Plaintiff has no adequate remedy at law.

**COUNT III**
**Abuse of Control**
**(Derivatively Against the Director and Officer Defendants)**

123. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

124. The Director and Officer Defendants' bad acts alleged herein constituted an abuse of their ability to control and influence Grocery Outlet, for which they are legally responsible.

125. As a direct and proximate result of the Director and Officer Defendants' abuse of control, Grocery Outlet has sustained significant damages. Due to the bad acts alleged herein, the Director and Officer Defendants are liable to the Company.

126. Plaintiff has no adequate remedy at law.

**COUNT IV**
**Gross Mismanagement**
**(Derivatively Against the Director and Officer Defendants)**

127. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

128. By their actions alleged herein, the Director and Officer Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to carefully managing the assets and business of Grocery Outlet in a manner consistent with the operations of a publicly-held corporation.

129. As a direct and proximate result of the Director and Officer Defendants' gross mismanagement and breaches of duty alleged herein, Grocery Outlet has sustained and will continue to sustain significant damages.

130. Due to the bad acts and breaches of duty alleged herein, the Director and Officer Defendants are liable to the Company.

131. Plaintiff has no adequate remedy at law.

**COUNT V**
**Waste of Corporate Assets**
**(Derivatively Against the Director and Officer Defendants)**

132. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

133. The Director and Officer Defendants compelled Grocery Outlet to pay the Director and Officer Defendants excessive salaries and fees to the detriment of the stockholders and Grocery Outlet.

134. Due to the foregoing, and by failing to properly consider the interests of Grocery Outlet and its public stockholders, the Director and Officer Defendants have compelled Grocery Outlet to waste valuable corporate assets while Grocery Outlet suffered from undisclosed issues. The Director and Officer Defendants' bad acts have compelled Grocery Outlet to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

135. Due to the waste of corporate assets, the Director and Officer Defendants are each liable to Grocery Outlet.

136. Plaintiff has no adequate remedy at law.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

137. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

139. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxies. In the Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

140. The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Grocery Outlet misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

141. Plaintiff, on behalf of Grocery Outlet, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

(a) Declaring that Plaintiff may maintain this derivative action on behalf of Grocery Outlet and that Plaintiff is a proper and adequate representative of the Company;

(b) Declaring that demand against the Board is excused as futile;

(c) Declaring that Defendants breached their fiduciary duties and were unjustly enriched;

(d) Against all of the Defendants and in favor of Grocery Outlet for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

(e) Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to, the institution of appropriate corporate governance measures;

(f) Awarding Grocery Outlet restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

(g) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

(h) Granting such other and further equitable relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 28, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: _/s/ Kevin Ruf_
Kevin Ruf
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
kruf@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com

**ROWLEY LAW PLLC**
Shane Rowley
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
srowley@rowleylawpllc.com

*Attorneys for Plaintiff*

# VERIFICATION

I, Keith Conners, am the named plaintiff in the foregoing derivative action. I have read the foregoing Verified Shareholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. I further declare that I am a current holder, and have been a holder, of Grocery Outlet Holding Corp. common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of April, 2025.

Keith Conners
Keith Conners (Apr 23, 2025 11:29 EDT)

Keith Conners